U.S. DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
RECEIVED - LAFAYETTE

JUN 2 8 2018

TONY R. MOORE, CLERK
BY _____ DEPUTY

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

DAVID M. WELLS

VERSUS

DISA GLOBAL SOLUTIONS INC

CIVIL ACTION NO. 6:17-CV-00014

UNASSIGNED DISTRICT JUDGE

MAGISTRATE JUDGE HANNA

## REPORT AND RECOMMENDATION

Currently pending is the motion for summary judgment (Rec. Doc. 34), which was filed by the defendant, DISA Global Solutions, Inc. ("DISA"). The plaintiff, David M. Wells ("Wells"), filed an opposition (Rec. Docs. 39, 41), to which DISA replied (Rec. Doc. 42). Oral argument was held on June 28, 2018. The motion was referred to the undersigned for review, report, and recommendation in accordance with the provisions of 28 U.S.C. § 636 and the standing orders of this Court. Considering the evidence, the law, and the arguments of the parties, and for the reasons fully explained below, it is recommended that the motion be GRANTED and that the plaintiff's claims against DISA be DISMISSED WITH PREJUDICE.

## BACKGROUND

This case arises out of Wells' allegations that he suffered damages caused by DISA's negligent administration of an employment-related drug test. At all times relevant herein, Wells has been employed by Chet Morrison Contractors, L.L.C.

1

("Chet Morrison"), as a diver, an occupation in which he has extensive training and years of experience.[1] As a diver, Wells performs underwater installation, inspection, and decommissioning work on pipelines and drilling platforms for energy companies with which Chet Morrison contracts.[2] DISA is a third-party administrator of substance abuse policies for participating "Owners" of work sites (*e.g.* an owner of a chemical plant or pipeline, such as Shell Oil) and "Contractors" hired to work on those sites (*e.g.* Wells' employer, Chet Morrison), to the extent those Owners and Contractors join DISA's Contractors Consortium ("DCC") program.[3]

As relevant to this case, one of the substance abuse policies under the DCC program is the DISA Contractors Consortium Hair Testing Substance Abuse Policy (the "DCCHT" policy).[4] To be eligible to work on participating Owners' work sites, employees of participating Contractors ("Contractor Employees"), such as Wells, must become members of the DCC program by signing a Universal Membership Application.[5] Wells signed such an application, consenting to, among other things, drug testing and reporting in accordance with the DCCHT policy.[6]

---

[1] Rec. Doc. 1-2, p. 4, ¶¶ 11, 12(a), and 12(c); Rec. Doc. 34-4, p. 4.
[2] Rec. Doc. 34-4, pp. 4-5.
[3] Rec. Doc. 34-1, p. 1.
[4] Rec. Doc. 34-2. Although the policy was revised in July 2015, and again in December 2016, DISA notes that the policy in place at the time of the drug test at issue herein was the July 2015 version.
[5] Rec. Doc. 34-1, p. 1.
[6] Rec. Doc. 34-3; 34-4, p. 8.

2

In joining the DCC program, Wells agreed to the following:

> I have received and/or reviewed a copy of the [DCCHT policy]. I apply for membership in the [DCC] and/or . . . the [DCCHT] Program under the sponsorship of [Chet Morrison]. I agree, upon acceptance, to abide by all DCC and/or . . . [DCCHT policy], rules and regulations. I authorize the DCC to release my drug and/or alcohol test results to [Chet Morrison]. I also authorize the DCC to release information about my status in the DCC to those Companies on whose premises I seek to work or am currently working. . . . This release expires five years after the latest date on which I was no longer an "active" member of the [DCC]. I understand that I have a right to receive a copy of this authorization.[7]

For participating Owners and Contractors, the DCC program allows access to a work eligibility database that shows whether a Contractor Employee is compliant with a particular Owner's substance abuse policy, thereby allowing the Owner and Contractor to quickly staff a particular work site or project.[8] Within that database, Contractor Employees who are in compliance with the applicable substance abuse policy are designated as "Active," while those who are not in compliance are designated as "Inactive."[9] A Contractor Employee may be designated as "Inactive" for any of the following reasons: (1) no test on file; (2) positive test; (3) self-identification; (4) refusal to submit to a test; (5) failure to follow rehabilitation requirements; and (6) failure to consent to release test results or rehabilitation

---

[7] Rec. Doc. 34-3.
[8] Rec. Docs. 34-2, pp. 2-3; 34-1, p. 2.
[9] *Id.*; Rec. Doc. 34-2, p. 18.

3

records.[10] Although DISA's policy states that an "Inactive" designation "does not imply use or abuse of substances[,]"[11] Wells contends that "an Inactive designation most certainly implies drug use to the employer."[12]

Under the DCCHT policy, once a Contractor Employee has been notified of a positive result, he may request a "re-confirmation" test on his original hair sample, provided that the Owner's substance abuse policy allows it.[13] The policy further provides that, if permitted by the Owner's policy, the Contractor Employee may request a "re-collection" (*i.e.* submit a new hair sample), if the quantity of the original sample is insufficient to be subjected to re-confirmation testing.[14] Neither the DCCHT policy nor prevailing industry standards require that a re-confirmation test be conducted by a different lab from the one that conducted the initial test.[15] The policy states that "[a]ny confirmed presence of a substance in the sample results is a positive test."[16]

The test at issue in this case was not a random drug test; rather, it was a "pre-access" drug test, conducted so that Wells would be eligible for assignment on an

---

[10] Rec. Doc. 34-2, p. 18.
[11] *Id.*, p. 3.
[12] Rec. Doc. 41, p. 1.
[13] Rec. Docs. 34-2, p. 12.
[14] *Id.*
[15] Rec. Doc. 34-5, p. 4, ¶ 7 (Expert Witness Declaration of Dr. Barry J. Sachs, D.O.).
[16] Rec. Doc. 34-2, p. 12.

upcoming contract job between Chet Morrison and Shell Oil.[17] Pursuant to the DCCHT policy, a Contractor Employee who fails a pre-access drug test may enter and complete a rehabilitation program.[18] Upon successfully completing the rehabilitation program and passing a "return-to-duty" drug test, the Contractor Employee's work eligibility status will be changed to "Active" in DISA's database.[19] Even so, some Owners operate "zero-tolerance" work sites, meaning that once a Contractor Employee has been designated "Inactive" for any period of time, he may not be permitted to work on these zero-tolerance sites.[20]

It is undisputed that Wells' hair sample was collected, on June 22, 2016, by Occ Med of Lafayette ("Occ Med"), an independent contractor of DISA.[21] DISA does not own or operate Occ Med and does not employ or have any control over the employees of Occ Med or the methodology and procedures used by Occ Med in collecting hair samples.[22] "DISA [pays] Occ Med, as well as other collectors/collection sites for the urine and hair collections from donors who are being tested under [the DCC program]."[23] Prior to the June 22, 2016 hair test, all of

---

[17] Rec. Docs. 34-4, p. 6; 34-6, p. 3.
[18] Rec. Doc. 34-2, p. 14.
[19] *Id.*
[20] Rec. Docs. 34-2, p. 3; 34-4, pp. 7, 20, 22-23.
[21] Rec. Docs. 34-6, p. 3; 34-7, p. 2, ¶¶ 3-4.
[22] Rec. Doc. 34-7, pp. 2-3, ¶ 4.
[23] *Id.*

Wells' drug tests had been conducted via urine, rather than hair, samples.[24] Although he had no comparative basis, Wells testified that the relevant hair sample collection process seemed normal and that he did not see anything that led him to believe that his hair sample had been contaminated or mixed up with another sample.[25]

After the sample was collected, Wells signed Psychemedics Corporation's ("Psychemedics") custody and control form, indicating that he "provided the sample" at issue; the sample "was cut close to the skin;" he "witnessed the collector seal the sample;" and he "consent[ed] to the testing of the sample by Psychemedics [] and to the release of the results to the authorized recipient."[26] Psychemedics was the laboratory responsible for analyzing Wells' hair sample for the presence of prohibited substances.[27] The summary of procedures and results shows that the sample was first screened by Enzyme ImmunoAssay (EIA), which yielded a "presumptive positive" for Cocaine, and then washed and subjected to confirmatory testing by Liquid Chromatography/Mass Spectrometry/Mass Spectrometry (LC/MS/MS), which confirmed the positive result.[28] Psychemedics' report further indicates that Wells' sample tested positive for cocaine and a cocaine metabolite,

---

[24] Rec. Doc. 34-4, pp. 6, 11.
[25] Rec. Doc. 34-4, pp. 6, 11, 21.
[26] Rec. Doc. 34-6, p. 3; *see also* Rec. Doc. 34-5, pp. 33-126 (chain of custody shown in Psychemedics' "Laboratory Data Package").
[27] Rec. Doc. 34-6; 34-8, p. 2.
[28] Rec. Doc. 34-6, p. 2.

6

Benzoylecgonine, which "establishes that the subject has ingested Cocaine."[29] DISA does not own or operate Psychemedics and does not employ or have any control over the employees of Psychemedics or the methodology and procedures Psychemedics uses in analyzing hair samples.[30] After the sample was analyzed and determined to be positive for cocaine, Psychemedics then sent Wells' positive result to University Services, L.L.C. ("University").[31]

University is a "wholly owned subsidiary of DISA[,] [which] employs or contracts with Medical Review Officers ("MROs"), who are licensed physicians responsible for determining if there could be any legitimate explanation for a Contractor Employee's positive drug test result."[32] "Part of University's review involves (when it is necessary) having an MRO or MRO Assistant ("MRO-A") interview the Contractor Employee to obtain information (such as recent prescriptions or surgeries) that might have a bearing on whether there is a legitimate explanation for the Contractor Employee's positive result."[33]

In Wells' case, he was notified of his positive test results when he received a phone call from MRO, Dr. Terri Hellings, on June 29, 2016.[34] Wells testified that

---

[29] *Id.*, pp. 2, 4.
[30] Rec. Doc. 34-7, p. 3, ¶ 6.
[31] Rec. Doc. 34-6, pp. 2, 4.
[32] Rec. Doc. 34-7, p. 3, ¶ 7.
[33] *Id.*; Rec. Doc. 34-5, p. 3, ¶¶ 5, 6; 34-2, p. 11.
[34] Rec. Doc. 34-4, p. 12; 34-9, p. 2.

Dr. Hellings inquired as to whether he had taken any medications, been to the doctor or dentist recently, or experienced any other health issues, and then advised Wells of his positive test result.[35] Wells testified that he responded in disbelief and, upon hanging up the phone, "[s]at there at the edge of the bed with my hands on my side of my head and trying to figure out what was going on and why this was happening to me."[36] Dr. Hellings completed a MRO Worksheet, indicating that the final result was a verified positive, and informed DISA of Wells' positive result.[37] Pursuant to the DCCHT policy, "[i]f the result is confirmed as positive, the donor will become 'Inactive' and subject to the rehabilitation requirements outlined in [the] policy."[38] DISA therefore designated Wells as "Inactive" in its work eligibility database.[39]

On June 30, 2016, after speaking with the MRO and learning of his positive result, Wells requested and received a copy of his drug test results and contacted his employer, Chet Morrison, about taking a re-confirmation test.[40] Wells then, at the suggestion of his employer, contacted DISA to request a re-confirmation test on his original sample.[41] Wells testified that he wanted a re-collection, meaning a new test

---

[35] Rec. Doc. 34-4, p. 12.
[36] Id.
[37] Rec. Doc. 34-9, p. 3.
[38] Rec. Doc. 34-2, p. 11.
[39] Rec. Doc. 34-1, p. 6.
[40] Rec. Doc. 34-4, p. 13; 34-10, p. 2.
[41] Id. at pp. 13, 19.

conducted on a new hair sample; however, he was advised by the MRO department that his only option was to have a re-confirmation test performed on the original hair sample in the same lab, Psychemedics.[42] On July 6, 2016, Wells submitted a reanalysis request form in accordance with DISA's protocol, for which Chet Morrison agreed to pay the $150.00 re-confirmation testing fee.[43] Psychemedics conducted the re-confirmation test on the original hair sample and then informed University of the positive result of the re-confirmation test.[44] Through an MRO, University again contacted Wells to advise him of the positive result of the re-confirmation test.[45]

Wells testified that he also had an independent hair test sampled at a drug testing facility in New Iberia, Louisiana, in July 2016, and that the test result was negative.[46] However, Wells did not report or send these results to Chet Morrison, DISA, the MRO, Psychemedics, or Occ Med, and he has not produced the results of said drug test in response to discovery requests in the instant litigation.[47]

After both the original and the re-confirmation test, DISA informed Wells of his option to begin the return-to-duty process, which he elected to do after receiving

---

[42] *Id.*
[43] Rec. Docs. 34-11; 34-12.
[44] Rec. Docs. 34-6, p. 2; 34-13.
[45] Rec. Doc. 34-4, p. 14.
[46] Rec. Doc. 34-4, pp. 16-17.
[47] Rec. Doc. 34-4, p. 17; 34-1, p. 7 n. 4.

9

the re-confirmation test results.[48] As required under the DCCHT policy, Wells completed a rehabilitation program and then took the required return-to-duty drug test in September 2016.[49] Wells testified that he returned to work on October 25, 2016.[50]

On December 2, 2016, Wells filed suit against DISA in the 15th Judicial District Court, in Lafayette Parish, Louisiana.[51] Wells alleged that he suffered damages because DISA, either directly or through its agents, was negligent in one or more of the following ways: "[f]ailing to properly take and identify the hair sample, including . . . the failure to take a sufficient amount of hair;" "[a]llowing contamination of the hair sample either at the time of collection and/or . . . during transporting the sample to the testing facility and/or during the testing itself;" "[f]ailing to ensure that the hair [sample] tested and on which the results were reported was the same hair sample taken from [Wells];" "[f]ailing to conduct the test properly to produce correct results;" "[f]ailing to establish procedures and guidelines that would ensure tests yield accurate results;" "[f]ailing to follow the procedures

---

[48] *Id.*
[49] Rec. Doc. 34-4, pp. 14-15, 16, 18; 34-2, p. 14.
[50] Rec. Doc. 34-4, p. 23.
[51] Rec. Docs. 1, p. 1, ¶ 1; 1-2 (Petition for Damages, *David M. Wells v. DISA Global Solutions, Inc.*, Case No. 2016-6363-C).

and guidelines that were in effect; and" "[i]ncorrectly reporting the results of the test."[52] DISA removed the action to this Court on January 5, 2017.[53]

In the instant motion, DISA seeks summary judgment on the grounds that Wells has failed to establish that DISA owed or breached any duty. DISA asserts that Wells' allegations all relate to the collection and analysis of his hair sample, yet it is undisputed that DISA neither collected nor analyzed Wells' hair sample. Rather, DISA's role consisted of verifying the positive test results through an MRO, reporting this information to Wells' employer, and changing Wells' designation in the work eligibility database to "Inactive."[54] Alternatively, DISA asserts that it is shielded from liability, because Wells' own testimony establishes that DISA conformed to the testing and confirmation process outlined in the DCCHT policy, to which Wells voluntarily consented as a member of the DCC program. In response, Wells argues that DISA breached its "duty to protect against the risk of harm of a false positive" by failing to allow a second hair sample to be collected and analyzed, *i.e.* a "re-collection," as it is referred to under the DCCHT policy.[55]

---

[52] Rec. Doc. 1-2, pp. 3-4, ¶¶ 6(a)-(g), 12(a)-(f).

[53] Rec. Doc. 1.

[54] As explained herein, for purposes of this ruling, the Court assumes without deciding that DISA's role legally extends to include the actions of the MRO, whom DISA's "wholly owned subsidiary," University, either "employs or contracts" with, in order to provide verification of drug test results. (*see* Rec. Doc. 34-7, p. 3, ¶ 7).

[55] Rec. Doc. 39.

11

<u>ANALYSIS</u>

**A.    THE SUMMARY JUDGMENT STANDARD**

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is appropriate when there is no genuine dispute as to any material fact, and the moving party is entitled to judgment as a matter of law. A fact is material if proof of its existence or nonexistence might affect the outcome of the lawsuit under the applicable governing law.[56] A genuine issue of material fact exists if a reasonable jury could render a verdict for the nonmoving party.[57]

The party seeking summary judgment has the initial responsibility of informing the court of the basis for its motion and identifying those parts of the record that demonstrate the absence of genuine issues of material fact.[58] If the moving party carries its initial burden, the burden shifts to the nonmoving party to demonstrate the existence of a genuine issue of a material fact.[59] All facts and inferences are construed in the light most favorable to the nonmoving party.[60]

---

[56] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Sossamon v. Lone Star State of Tex.*, 560 F.3d 316, 326 (5th Cir. 2009); *Hamilton v. Segue Software, Inc.*, 232 F.3d 473, 477 (5th Cir. 2000).
[57] *Brumfield v. Hollins*, 551 F.3d 322, 326 (5th Cir. 2008) (citing *Anderson*, 477 U.S. at 252); *Hamilton*, 232 F.3d at 477.
[58] *Washburn v. Harvey*, 504 F.3d 505, 508 (5th Cir. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).
[59] *Washburn*, 504 F.3d at 508.
[60] *Brumfield*, 551 F.3d at 326 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986)).

If the dispositive issue is one on which the nonmoving party will bear the burden of proof at trial, the moving party may satisfy its burden by pointing out that there is insufficient proof concerning an essential element of the nonmoving party's claim.[61] The motion should be granted if the nonmoving party cannot produce evidence to support an essential element of its claim.[62]

When both parties have submitted evidence of contradictory facts, a court is bound to draw all reasonable inferences in favor of the nonmoving party.[63] The court cannot make credibility determinations or weigh the evidence, and the nonmovant cannot meet his burden with unsubstantiated assertions, conclusory allegations, or a scintilla of evidence.[64] "When all of the summary judgment evidence presented by both parties could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial and summary judgment is proper."[65]

---

[61] *Norwegian Bulk Transport A/S v. International Marine Terminals Partnership*, 520 F.3d 409, 412 (5th Cir. 2008) (citing *Celotex Corp.*, 477 U.S. at 325).

[62] *Condrey v. Suntrust Bank of Ga.*, 431 F.3d 191, 197 (5th Cir. 2005).

[63] *Boudreaux v. Swift Transp. Co., Inc.*, 402 F.3d 536, 540 (5th Cir. 2005).

[64] *Id.*

[65] *Greene v. Syngenta Crop Protection, Inc.*, 207 F.Supp.2d 537, 542 (M.D. La. 2002) (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

## B.    THE APPLICABLE LAW

In a diversity case such as this one, federal courts apply state substantive law, here Louisiana law.[66] Wells' negligence claims arise under Louisiana Civil Code article 2315, which provides, in pertinent part, that "[e]very act whatever of man that causes damage to another obliges him by whose fault it happened to repair it." "If the act involves the failure to exercise reasonable care, it is deemed negligence."[67]

Louisiana courts employ the duty-risk analysis as the standard negligence analysis in determining whether to impose liability under article 2315.[68] "This approach provides an analytical framework for evaluation of liability. One analysis requires proof by the plaintiff of five separate elements: (1) the defendant had a duty to conform his conduct to a specific standard (the duty element); (2) the defendant's conduct failed to conform to the appropriate standard (the breach element); (3) the defendant's substandard conduct was a cause in fact of the plaintiff's injuries (the cause-in-fact element); (4) the defendant's substandard conduct was a legal cause of the plaintiff's injuries (the scope of liability or scope of protection element); and (5) the actual damages (the damages element)."[69]

---

[66] *Moore v. State Farm Fire & Cas. Co.*, 556 F.3d 264, 269 (5th Cir. 2009); *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938).

[67] *Meany v. Meany*, 639 So.2d 229, 233 (La. 1994).

[68] *Mathieu v. Imperial Toy Corporation*, 94-0952, p. 4 (La. 11/30/94); 646 So.2d 318, 321.

[69] *Lemann v. Essen Lane Daiquiris, Inc.*, 2005-1095 (La. 3/10/06); 923 So. 2d 627, 632–

14

In an action to recover damages allegedly caused by another's negligence, "the plaintiff has the burden of proving negligence on the part of the defendant by a preponderance of the evidence."[70] Because Wells would bear the burden of proof at trial, and DISA's motion for summary judgment has pointed to a lack of evidence with respect to each element of negligence, Wells now bears the burden of presenting competent summary judgment evidence to establish that there is a genuine issue of material fact for trial.[71]

## C.   WELLS FAILED TO ESTABLISH THAT DISA OWED OR BREACHED ANY DUTY

"A threshold issue in any negligence action is whether the defendant owed the plaintiff a duty."[72] "In deciding whether to impose a duty in a particular case, the court must make a policy decision in light of the unique facts and circumstances presented."[73] "The inquiry is whether the plaintiff has any law (statutory, jurisprudential, or arising from general principles of fault) to support the claim that the defendant owed him a duty."[74]

---

33.

[70] *Hanks v. Entergy Corp.*, 2006-477 (La. 12/18/06); 944 So. 2d 564, 578.
[71] *See Norwegian Bulk,* at n. 60, and *Condrey,* at n. 61, *supra.*
[72] *Lemann,* 923 So.2d at 633 (citing *Meany,* 639 So.2d at 233).
[73] *Id.* (citing *Socorro v. City of New Orleans*, 579 So.2d 931, 938 (La. 1991)).
[74] *Id.* (citations omitted).

Here, Wells generally alleges that DISA owed a "duty to protect against the risk of harm of a false positive."[75] In support of the existence of this alleged duty, Wells cites to a handful of Louisiana cases, which are easily distinguishable as creating a duty on the part of the drug testing laboratories responsible for analyzing the relevant samples. In contrast, here, it is undisputed that Occ Med was the entity responsible for collecting Wells' hair sample and Psychemedics was the laboratory responsible for analyzing the sample to determine whether any prohibited substances were present. It is further undisputed that DISA does not own or operate Occ Med or Psychemedics; does not employ or have any control over the employees of Occ Med or Psychemedics; and does not have any control over the methodology and procedures used by Occ Med or Psychemedics in collecting and/or analyzing hair samples, respectively. Wells testified that he understood that it was Occ Med who collected his sample and Psychemedics who analyzed his sample.[76]

Wells first cites *Elliott v. Laboratory Specialists, Inc.*, 588 So.2d 175, 175-76 (La. App. 5 Cir. 1991), in which a plaintiff successfully prevailed in a jury trial against a drug testing lab for negligently testing the plaintiff's urine sample. At trial, the plaintiff presented two "drug testing experts," one a PhD and the other a medical

---

[75] Rec. Doc. 39.
[76] Rec. Doc. 34-4, p. 17; Rec. Doc. 35, p. 8.

16

doctor, who both testified that the lab's protocol and methodology were "scientifically inadequate and failed to meet the [relevant] scientific standards[.]"[77] When the lab appealed, Louisiana's Fifth Circuit affirmed the jury verdict, finding that it would be "an abuse of fundamental fairness and justice" to suggest that the lab did not owe the plaintiff a "duty to analyze his body fluid in a scientifically reasonable manner."[78] The other two cases, both issued by Louisiana's Fourth Circuit, held that independent drug testing labs, hired by an employer, owe a duty of reasonable care to the employees who are tested.[79]

Given the undisputed facts that Occ Med and Psychemedics are both independent entities, over which DISA exercises no ownership or control, Wells has failed to establish that the foregoing jurisprudence establishes that DISA owed Wells a duty to control those entities' actions. "Louisiana law is clear that no duty to protect against or control the actions of a third party exists unless a special relationship exists to give rise to such a duty."[80] Traditional examples of such special relationships include those which exist between "parent and child; employer and employee;

---

[77] *Elliott*, 588 So.2d at 176.

[78] *Id.*

[79] *See Nehrenz v. Dunn,* 593 So.2d 915, 918 (La. App. 4 Cir. 1992); *Lewis v. Aluminum Co. of America*, 588 So.2d 167, 170 (La. App. 4 Cir. 1991).

[80] *Beck v. Schrum*, 41,647 (La. App. 2 Cir. 11/1/06); 942 So. 2d 669, 672 (citing *Mosley v. Temple Baptist Church of Ruston, Louisiana, Inc.*, 40,546 (La. App. 2d Cir. 1/25/06); 920 So.2d 355).

carrier and passenger; innkeeper and guest; shopkeeper and business visitor; restaurateur and patron, jailer and prisoner; and teacher and pupil."[81] Here, it is undisputed that no such special relationship exists between DISA and either Occ Med or Psychemedics. Furthermore, in contrast to the plaintiff in *Elliott*, Wells has offered *no* evidence – expert or otherwise – to establish that DISA's policy or procedures were either inadequate or below industry standards.

Because it is undisputed that DISA neither collected nor analyzed Wells' hair sample, Wells has wholly failed to establish that DISA may be held liable for any of the following allegations: "[f]ailing to properly take and identify the hair sample, including . . . the failure to take a sufficient amount of hair;" "[a]llowing contamination of the hair sample either at the time of collection and/or . . . during transporting the sample to the testing facility and/or during the testing itself;" "[f]ailing to ensure that the hair [sample] tested and on which the results were reported was the same hair sample taken from [Wells];" and/or "[f]ailing to conduct the test properly to produce correct results[.]"[82] These claims must be dismissed.

In light of Wells' failure to directly address, in response to the instant motion for summary judgment, the complaint's remaining three allegations – "[f]ailing to

---

[81] *Id.* (citation omitted).
[82] Rec. Doc. 1-2, pp. 3-4, ¶¶ 6(a)-(d).

18

establish procedures and guidelines that would ensure tests yield accurate results;" "[f]ailing to follow the procedures and guidelines that were in effect; and" "[i]ncorrectly reporting the results of the test" – this Court will simply assume *arguendo* that Wells could establish that DISA, either directly or through the actions of its wholly-owned subsidiary University, owed him some duty.[83] Wells' negligence claims nonetheless fail for lack of *any* evidence to establish breach.

Wells repeatedly argues, without any evidentiary support, that DISA breached its "duty to protect against the risk of harm of a false positive" by failing to allow a second hair sample to be collected and analyzed, *i.e.* a "re-collection," as it is referred to under the DCCHT policy.[84] As previously referenced herein, once Wells was notified of the positive result, the DCCHT policy allowed him to request a "re-confirmation" test on his original hair sample, provided that the Owner's substance abuse policy allows it.[85] The policy further provides that, *if permitted by the Owner's policy*, the Contractor Employee may request a "re-collection" (*i.e.* submit a new

---

[83] As stated at footnote 54, *supra*, for purposes of this ruling, the Court will assume *arguendo* that DISA assumes responsibility, as it has been vaguely submitted that DISA either employs or contracts with MROs, employed by University, which is a wholly-owned subsidiary of DISA. For purposes of this ruling, this is not a material assumption, as it is undisputed that the MRO discharged her duty, under the DCCHT policy, to review Psychemedics' report and evaluate whether Wells had a legitimate medical explanation for the positive test result. *See* Rec. Docs. 34-4, p. 12; 34-5, pp. 3-4, ¶ 6. Because neither the MRO nor DISA could have changed Psychemedics' analysis and report of the positive test result, Wells has at least failed to establish breach or causation.

[84] Rec. Doc. 39.

[85] Rec. Docs. 34-2, p. 12.

hair sample), *if the quantity of the original sample is insufficient to be subjected to re-confirmation testing.*[86] It is undisputed that, upon Wells' request, Psychemedics conducted a "re-confirmation" test on Wells' original hair sample. Although Wells testified that he believed that the test result would have been different had a new hair sample been tested by a different lab, he has submitted no evidence to support that claim.

On the other hand, in support of its motion for summary judgment, DISA has produced an expert declaration of Dr. Barry Sachs, who has been a certified MRO since 1996, and has worked on behalf of DISA and other entities.[87] Dr. Sachs explains, in part, that "[n]either the DCCHT [policy] nor prevailing industry standards require that a donor's hair sample under re-confirmation testing at a different laboratory from the one at which the sample was originally tested."[88] Dr. Sachs further confirms that "[t]he analysis of a donor's hair specimen will not yield a non-negative or positive result for the presence of cocaine unless the donor has inhaled or ingested cocaine."[89] Having reviewed the DCCHT policy, Psychemedics' report and chain of custody documentation, and the MRO records in Wells' case, it is Dr. Sachs' opinion that "all of the appropriate procedures spelled out in the DCC

---

[86] *Id.* (emphasis added).
[87] Rec. Doc. 34-5, p. 2, ¶ 2, and p. 8.
[88] Rec. Doc. 34-5, p. 4, ¶ 7.
[89] *Id.* at p. 2, ¶ 3.

were followed by the DISA, Psychemedics, and University."[90] Dr. Sachs' expert declaration is unrefuted and establishes that DISA did not fail to "establish procedures and guidelines that would ensure that tests yield accurate results" or "follow the procedures and guidelines that were in effect[.]"[91]

Lastly, Wells' complaint alleges that DISA was negligent in "[i]ncorrectly reporting the results of the test."[92] Wells does not dispute that Psychemedics reported that his hair sample tested positive; therefore, he does not claim that Psychemedics reported to DISA that the test result was negative and that DISA then "incorrectly reported" that the test result was positive. Instead, Wells simply asserts that he "has never used cocaine in his entire life" and is "drug-free."[93] However, "[s]ummary judgment may not be thwarted by conclusional allegations, unsupported assertions, or presentation of only a scintilla of evidence." *McFaul v. Valenzuela*, 684 F.3d 564, 571 (5th Cir. 2012). Wells has failed to refute DISA's expert testimony or present

---

[90] *Id.* at pp. 4-5, ¶ 8.
[91] Rec. Doc. 1-2, p. 4, ¶ 6(e), (f).
[92] *Id.* at ¶ 6(g).
[93] Rec. Doc. 1-2, p. 3, ¶ 5; Rec. Doc. 34-4, p. 21. As noted by DISA, Wells alleged that he underwent an independent drug test, in July 2016, the results of which were negative. Wells has neither produced these test results in discovery nor has he relied upon them in opposition to DISA's motion for summary judgment. As such, this Court has no basis upon which it might find that such test results could be considered relevant or reliable. Regardless, DISA correctly recognizes that courts have not looked favorably upon such evidence. *See* Rec. Doc. 34-1, p. 7 n. 4 (citing *Pride v. Laboratory Corp. of Am.*, 376 F. App'x 925, 927-28 (11th Cir. 2010)).

*any* competent summary judgment evidence to establish a genuine dispute as to any material fact.

In summary, for DISA to have breached any duty, first one must be owed, and secondly DISA must have acted unreasonably in administering the DCC program and DCCHT policy with respect to Wells. DISA has shown, and Wells' own testimony corroborates, that it followed the exact procedure called for within the DCC program, as contained in the DCCHT policy, to which Wells consented. Dr. Sachs has confirmed that the procedures followed in this case were reliable and conformed to industry standards, and Wells has failed to refute that evidence. DISA is entitled to summary judgment in this case.

## CONCLUSION

For the reasons fully explained above, this Court recommends that DISA's motion for summary judgment (Rec. Doc. 34) be GRANTED and the plaintiff's claims be DISMISSED WITH PREJUDICE.

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Fed. R. Civ. P. 72(b), parties aggrieved by this recommendation have fourteen days from service of this report and recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within fourteen days after

being served with of a copy of any objections or responses to the district judge at the time of filing.

Failure to file written objections to the proposed factual findings and/or the proposed legal conclusions reflected in the report and recommendation within fourteen days following the date of its service, or within the time frame authorized by Fed. R. Civ. P. 6(b), shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the district court, except upon grounds of plain error. *See Douglass v. United Services Automobile Association*, 79 F.3d 1415 (5th Cir. 1996).

Signed at Lafayette, Louisiana on this _28th_ day of June 2018.

PATRICK J. HANNA
UNITED STATES MAGISTRATE JUDGE